Filed 4/30/15  P. v. Lewis CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOEL LADON LEWIS et al.,<br><br>    Defendants and Appellants. | C064781<br><br>(Super. Ct. Nos. SF110732A,<br>SF110732B) |

A jury convicted codefendants Joel Ladon Lewis and Gerell Lee Whatley of first degree murder, four attempted murders, eight armed robberies, two attempted robberies and a burglary.  Various enhancement allegations were found to be true.  The trial court sentenced them to life in prison without the possibility of parole for the murder, four life terms for the attempted murders, and determinate sentences totaling 40 years four months for Lewis and 17 years four months for Whatley.

1

A third codefendant, Delisa Bryant, was tried at the same time for murder and robbery, but the jury found Bryant guilty of only the lesser included offense of receiving stolen property. The trial court sentenced Bryant to probation for five years. Bryant did not appeal.

We will address Lewis's appellate contentions in part I of this opinion, and Whatley's contentions in part II.

Lewis interrupted a pretrial proceeding to complain in very profane terms that he was angry with his lawyer and did not understand what was going on in the courtroom. The trial court promptly conducted an in-camera hearing, denied what it construed as a *Marsden* motion,[1] and suspended all proceedings to assess whether Lewis was competent to stand trial. The trial court convened a jury which, three weeks later, determined that Lewis was competent.

Lewis now challenges his competency trial, claiming (A) the prosecutor improperly preconditioned the jurors during voir dire, (B) Lewis was denied his right to confront Bryant when the trial court restricted Bryant's cross-examination, (C) the trial court erred in allowing testimony from Bryant's attorney, and (D) cumulative prejudicial error.

We conclude Lewis's claim of cumulative prejudicial error has merit. The prosecutor's conduct during the competency trial was improper and the trial court erred in allowing the lay opinion testimony of Bryant's lawyer. Lewis was not able to meaningfully participate in his defense and his constitutional rights to due process and a fair trial were abridged. Accordingly, we do not reach his claims of error in the criminal trial. We will reverse Lewis's conviction and remand for a second competency hearing

---

[1] *People v. Marsden* (1970) 2 Cal.3d 11 (motion for substitution of counsel).

to be followed by a new trial if and when Lewis is able to understand the proceedings and assist his attorney.

Whatley contends (A) the trial court abused its discretion in denying his motion to sever his trial from Bryant's trial, (B) the prosecutor committed misconduct by charging Bryant with murder even though the prosecutor did not believe Bryant was guilty of murder, and (C) Whatley's lawyer was ineffective because he did not move to sever Whatley's trial from Lewis's trial. Whatley's contentions lack merit and we will affirm the judgment against him.

BACKGROUND

Early on the morning of October 22, 2008, federal prison worker Michael Rutledge was found face-down near his driveway, his wallet missing. The door of his truck was open. He had been shot in the head while kneeling or lying on the ground. Rutledge died from the gunshot wound.

Rutledge normally left for work by 5:00 a.m. A neighbor testified that she heard a gunshot at 4:21 a.m. The neighbor's husband also heard the gunshot but estimated the time at 4:25 to 4:35 a.m.; neither reported it because they often heard gunshots in Stockton. A 9-1-1 call eventually was placed by someone collecting recyclables nearby. Paramedics arrived at 6:50 a.m. and awakened the victim's family.

The victim's wife testified that her husband carried no cash but he did carry a debit card and he kept the pin number for the card on a slip of paper inside his wallet. Before 5:20 a.m., the victim's debit card was used to make two cash withdrawals of $180 each. A third successive attempt to use the card was denied because of the card's daily cash withdrawal limit. A few minutes later, at a truck stop, another attempt to withdraw cash was denied, but a $60 gas purchase went through. Subsequent attempts to use cards from the victim's wallet were unsuccessful.

Police investigating the Rutledge murder obtained surveillance video footage from a truck stop and a bank where cards from the victim's wallet had been used. Later that

3

day, a green Jeep Cherokee matching the one in the surveillance tapes was observed parked in front of a house on South Orange Street, where Bryant and Lewis lived. The Jeep, which had "for sale" and a telephone number written on the back window, belonged to Whatley. While police were investigating the vehicle, Lewis opened the door to the house, engaged in a struggle with police officers and was arrested. He was 19 years old. When police searched the house, they found ski masks, a loaded gun, the murder victim's wallet, and some property belonging to other recent robbery victims.

Bryant testified that she was 40 years old at the time of the crimes and lived on South Orange Street with her young children. She was dating Lewis's mother, who also lived in the home with Lewis and Lewis's brother. Lewis's nickname was "No-No" for "[Know] No Better." Bryant later testified that Lewis had "personality changes" when he became angry, so she was afraid of him. Bryant said she and her children and Lewis's mother were in Elk Grove from October 15 to 21, 2008. They went there because Lewis and his brother had beaten her up and threatened to kill her; she said Lewis had physically assaulted her on several occasions and also "tormented . . . the rest of the household" because, she surmised, he was abused by a foster parent and should have been taking psychotropic medication. Before she returned to her home, Lewis apologized to her over the phone.

Lewis and Whatley were friends. Bryant had swapped cars with Whatley for the trip to Elk Grove because her car needed repairs. At around 9:30 p.m. on October 21, Bryant and her children picked up Whatley at his house and returned to South Orange Street. Lewis and Whatley then left the house in Whatley's Jeep. Those remaining at the house had a meal at about 1:30 or 2:00 a.m. Bryant said she later fell asleep playing games on her computer and awoke to see Whatley and Lewis; Lewis had what appeared to be a credit card, which he put on the table nearby.

Bryant said she and Lewis and Whatley took the card and got into Whatley's Jeep; the Jeep had the words "for sale" and a phone number on the back. They drove the

4

vehicle to a Valero Country Market. Whatley tried to use the card to buy gas and, when that failed, Whatley gave Bryant the card and a slip of paper with the pin number. Using the card and pin number, Bryant successfully made withdrawals from the ATM inside the store. They went to another gas station where Whatley used the card to buy gas.

The group made several other unsuccessful attempts to use the card before returning to South Orange Street. They arrived there at about 6:00 a.m. Bryant said Lewis gave her the wallet and she placed it under a dresser. Bryant was still at home when police arrived later that day and struggled to subdue Lewis.

Police connected Lewis and Whatley to a series of armed robberies that had begun on October 16, based on cell phone records and other evidence, some of which was recovered from Bryant's home. Although the robbers were reported by some to have worn ski masks or bandanas covering their faces, some of the victims identified Lewis and Whatley from photographs. Lewis and Whatley were eventually charged with ten counts of robbery, four counts of attempted murder and various other related crimes.[2] Lewis, Whatley and Bryant were jointly charged with the robbery and special circumstances homicide of Rutledge and related crimes.

On March 2, 2009, during pretrial proceedings, the trial court determined that a mental competency evaluation was warranted under Penal Code section 1368 because of Lewis's bizarre and disruptive conduct in the courtroom. With the agreement of Lewis's court-appointed counsel, the pretrial proceedings were suspended. On March 5, 2009, the trial court appointed a psychiatrist, Kent Rogerson, and a psychologist, Wendy Weiss, to evaluate whether Lewis was competent to stand trial. The experts reported back to the court on March 26, that Lewis was not competent. The prosecutor requested a jury trial on competency.

---

[2] We do not recount details of the robbery-related crimes because there are no challenges about them on appeal, although we do note there were similarities among them.

5

A jury was convened for the competency trial. The jury selection process is detailed in the discussion *post*. The court-appointed experts testified. In addition, the defense retained neuropsychologist Myla Young, psychiatrist George Wilkinson, and clinical psychologist John Chellsen to evaluate Lewis. Each of them also testified. Experts testified that Lewis had a very limited understanding of the proceedings and that he was not able to rationally assist counsel. Three of the experts recommended that he be confined to a locked facility for a period of time to become stabilized on antipsychotic medication and, while confined, that he receive training to restore his competence. No expert opined that Lewis was competent and no expert was equivocal or uncertain about his lack of competence.

Neuropsychologist Myla Young testified that Lewis had a history of head trauma and drug use. Based on her own testing of Lewis, Dr. Young said Lewis had an IQ of 65 by one scale and 69 by another. She said that put him in the exceptionally low range and gave him the mental ability of a six-and-a-half-year-old child. Dr. Young said Lewis could read at the second grade level and do arithmetic and spelling at the third grade level, but he also had significant frontal lobe impairment, limited impulse control, limited attention and a tendency to misinterpret and misunderstand, particularly complex issues. Dr. Young said frontal lobes "help us to comprehend what's going on in a complex situation" and learn from experience. She used the term "executive functioning" to include "the ability to think, to reason, to problem solve, to plan, to use good judgment, to anticipate the consequences of your actions before you actually act, [and] to change your actions." Although Lewis tested higher in a few areas, she said he was severely impaired in executive functioning most of the time. She added that he had major depression and a psychotic disorder and she doubted his ability to work with an attorney.

The prosecutor asked whether Dr. Young had obtained MRI, CT or PET scans or x-rays, but Dr. Young said none of those were needed to diagnose frontal lobe damage with certainty. In addition, the prosecutor asked whether Dr. Young knew what Lewis

said to his girlfriend at a jail visit nine months earlier and whether she had reviewed tapes of him in jail, read the letters he wrote from jail or talked to the crime victims about him. Dr. Young said she had not. The trial court sustained an objection to a question about whether people with more information would disagree with her.

Lewis had an outburst in the courtroom earlier in the morning when his lawyer referred to him as a "crack baby." He lost further control when Dr. Young suggested that a vast proportion of the population was smarter than he was. As Dr. Young continued to testify about Lewis's intelligence, Lewis yelled a stream of epithets and was removed from the courtroom.

The prosecutor asked Dr. Young on cross-examination if it did not demonstrate executive functioning to get someone on his hands and knees while he begs for his life and then to shoot and kill that person when he does not give you money. Dr. Young said that may be the opposite of executive functioning. The prosecutor placed his hand in a mock shooting motion against the heads of jurors, asking "What about you don't shoot him in the toe or arm, you shoot him right in the frontal lobe --" Defense counsel objected to the prosecutor "going up to jurors and using them as examples and putting his hands on their heads," to which the prosecutor responded "point well taken" and the trial court said "okay." Dr. Young denied that shooting someone in the frontal lobe showed a mind capable of planning and carrying out the plan.

The court-appointed psychiatrist, Dr. Rogerson, reviewed all the evidence submitted to him by the prosecution and the defense. He diagnosed Lewis with psychosis, saying Lewis had auditory and visual hallucinations, disorganized thinking, difficulty putting concepts together and limited abstracting ability. Dr. Rogerson also found borderline intelligence, posttraumatic stress disorder and antisocial personality disorder. Although Lewis was taking numerous antipsychotic drugs prescribed for him in jail, they did not "get rid of the voices" and were not of much help. Dr. Rogerson said Lewis clumsily exaggerated some of his symptoms, but the psychiatrist had no doubt

7

Lewis had no more than a marginal understanding of the legal proceedings and could not rationally assist counsel. He believed more antipsychotic treatment and competency training would help and recommended six months in a locked hospital ward.

On cross-examination, the prosecutor asked Dr. Rogerson whether persons committed to a hospital were let out on weekend passes and day passes. Dr. Rogerson said perhaps after a number of years. The prosecutor asked if a patient could get a day pass or a four-day Christmas pass in as little as three years. Dr. Rogerson said he did not have that information. The prosecutor asked whether Dr. Rogerson had listened to a police detective's tape recorded investigative interviews or tape recordings of Lewis with jail visitors; Dr. Rogerson said he had not because the prosecutor had not sent them to him. The prosecutor also asked whether Dr. Rogerson interviewed Lewis's codefendant Whatley or defendant's mother, whom the prosecutor described as a four-time felon. Dr. Rogerson said he did know about the mother's criminal record. In addition, the prosecutor asked whether Dr. Rogerson had heard that Lewis was "going around the jail trying to talk to other inmates to get them to say certain things." Dr. Rogerson had no knowledge of such conversations.

The prosecutor referenced Dr. Rogerson's conclusion in his written report that Lewis had an antisocial personality, and asked whether a prisoner with this antisocial feature might be prone to deceit and manipulation. Dr. Rogerson agreed. The prosecutor added, "In fact, the hallmark of someone with this anti-social feature is you can't believe a word they say. They're perennial liars. They're manipulators and they've been do -- doing it their whole life. Is that a fair statement?" Dr. Rogerson said he would have to qualify that, because a prisoner may say the truth because it would benefit them, but he agreed you have to be very suspicious.

Dr. Rogerson testified that Lewis did not meet the criteria for cooperating with and rationally assisting counsel. The prosecutor asked whether there is a difference between someone who cannot cooperate with counsel because the person is schizophrenic and

8

thinks "people are Martians," and someone who chooses not to cooperate with counsel. Dr. Rogerson agreed there is a difference. The prosecutor subsequently asked: "19 years of his life, no meds. All of a sudden in jail, now all of a sudden he's incompetent. But just all of a sudden he needs meds. That didn't strike you as odd?" Dr. Rogerson replied, "It doesn't strike me as -- as totally inconsistent, no." The prosecutor referenced Lewis's school records, asking whether they indicated that when Lewis "doesn't get what he wants, he acts out by swearing, slapping, banging his head?" The doctor said, "That could be one interpretation." The prosecutor itemized various incidents of violence, misconduct and disruption in Lewis's school record and asked whether Dr. Rogerson saw an ongoing pattern indicating that Lewis is disruptive by nature. Dr. Rogerson said the pattern was what concerned him and supported his opinion. Dr. Rogerson said Lewis continues to have tantrums like a six-year-old and that is indicative of a very immature, distorted, attention problem. Dr. Rogerson said it was not his opinion that Lewis did not want to help his attorney. The prosecutor asked Dr. Rogerson questions about whether he had interviewed Lewis's neighbors, read Lewis's letters, interviewed Lewis's cellmates, read a 2007 arrest report, watched a videotape of Lewis's 2008 arrest, or recognized various robbery charging allegations. On redirect, Dr. Rogerson testified that he had read all of the records provided by the prosecutor (30 pages of criminal history) but had not been provided any of the other records the prosecutor asked about.

Dr. Weiss, the court-appointed psychologist, said Lewis's records showed language and intellectual delays by the age of three. She said Lewis had an "incredibly chaotic upbringing, even in utero." His intellectual impairment was evaluated at the age of 16 by two doctors whose reports she reviewed. She testified that Lewis's jail records revealed head-banging and suicidal thoughts in November 2008; then a few days later, "losing it" in court and banging his head to "get the voices out." The records she reviewed included repeated reports of auditory hallucinations in jail and the repeated administration of antipsychotic drugs.

9

When Dr. Weiss met Lewis, he denied thoughts of harming himself or others but he had poor eye contact, exhibited signs of paranoia and was unkempt and disheveled. Dr. Weiss said she always considers malingering and faking and acknowledged Lewis might have exaggerated to some extent, but she was confident he had a psychotic disorder, a cognitive disorder and borderline intellectual functioning, explaining that the current and historic symptoms were consistent with schizophrenia, not yet diagnosed because he was so young. It was her opinion that he was in a "decompensated state" and was not competent to stand trial. She opined that his anger and psychosis would prevent him from working with counsel. Dr. Weiss recommended psychotropic medication and a competency restoration treatment program.

During cross-examination of Dr. Weiss, the prosecutor focused on her prior testimony in which she said Lewis told her he did not know why he was in jail and did not know the possible penalties, and she said she believed him. The prosecutor asked whether she had reviewed all the tape recordings of Lewis's jail visits. Dr. Weiss said she did not review them because they were not provided to her. The prosecutor noted that in talking with others, Lewis referenced the murder and robberies, then asked, "do you think we might want to be suspicious of the defendant when he's telling you, 'I don't know why I'm here,' and yet he's telling other individuals at other times specifically why he's here?" Dr. Weiss agreed that could cause someone to be suspicious, but she was reporting what he told her. The prosecutor focused on her statement that she believed him, however, saying, "So I guess my point is, you bought it almost hook, line and sinker, didn't you?" Dr. Weiss replied, "I wouldn't say that, no."

The prosecutor asked if Dr. Weiss had read the reports regarding the charged crimes, establishing that she was not familiar with those details. On redirect, Dr. Weiss was asked if it was possible for someone who is mentally ill to have a normal conversation one day but months later decompensate and be in a much worse situation; Dr. Weiss said absolutely. She said stress can cause symptoms to get worse.

10

George Wilkinson, a forensic psychiatrist, was retained by the defense. He testified that he spent an aggregate of 9.4 hours interviewing Lewis at the jail. He also reviewed police and probation reports, medical and mental health records and the reports of the two court-appointed experts. He noted that Lewis's mother had been a crack cocaine addict throughout her pregnancy and Lewis was in foster care from infancy until the age of 13; he also observed that Lewis suffered abuse in foster care and that his mental health was questioned beginning at age three. Although Dr. Wilkinson described Lewis as "a mess psychologically from an early age," he believed he had "clearly deteriorated."

Dr. Wilkinson said it was not surprising that Lewis was not diagnosed as psychotic at an earlier age. He said such a diagnosis is more common in the late teens through the twenties. Lewis's jail records showed a diagnosis of psychosis and the administration of antipsychotic drugs, but no improvement. Dr. Wilkinson opined that Lewis was not competent to stand trial because he "had a major mental illness, that being the psychosis," and that "he'd lacked [sic] the capacity to attend in a rational or factual discussion of his legal -- legal dilemma." Dr. Wilkinson said the combination of mental illness with reduced intelligence made it hard for Lewis to focus or cooperate and caused him to believe his attorney was "in league with the devil and one of his enemies."

Dr. Wilkinson noted that the antipsychotic drugs prescribed for Lewis sometimes caused him stomach problems and, in any event, did not seem to be very effective. He recommended that Lewis be confined to a state hospital where Dr. Wilkinson believed a forced regimen of medicine, treatment groups and classes would help him become competent to stand trial.

During cross-examination of Dr. Wilkinson, the prosecutor asked whether it was true that there are more claims of incompetence in multiple-defendant cases, because one defendant goes to a state hospital, his codefendants go to trial and say the one in the hospital did it, they are found not guilty, and then the one from the state hospital comes

11

back and goes to trial alone and says the other two did it, and he is found not guilty, and that is "easier." Dr. Wilkinson responded, "No. No, no." The prosecutor asked whether Lewis had been arrested in 2006 for cocaine, vandalism and grand theft, but Dr. Wilkinson only knew from the medical record that Lewis had been psychologically evaluated near that time by juvenile authorities. Dr. Wilkinson agreed that the doctors who evaluated Lewis at age 16 did not describe him as delusional and that the Valley Mountain Regional Center concluded he was "not so severely handicapped" as to be eligible for their services.

The prosecutor asked if Dr. Wilkinson had listened to the tapes of Lewis's arrest comments or jail visits -- Wilkinson said he had not -- and then the prosecutor asked Dr. Wilkinson about his familiarity with details of the charged offenses. The trial court overruled an objection to a question asking Dr. Wilkinson to recount what one of the robbery victims told police.

Asking whether Dr. Wilkinson found the timing of Lewis's declared incompetence to be suspicious, the prosecutor said Lewis had been "okay" at many prior hearings -- "[s]howboating to the girls in the audience" at the November hearing -- but as the trial date approached he declared his incompetence. The prosecutor asked, "You don't find that a little suspicious that maybe he's trying to con you?" Dr. Wilkinson responded, "Of course that's something you always consider" in such an evaluation. Dr. Wilkinson said he was not present at the multiple court appearances in which the prosecutor described Lewis as okay, and could not speak to those, but he personally witnessed Lewis evidencing severe difficulties in his thinking and behavior in a meeting on December 4, 2008. Dr. Wilkinson acknowledged his earlier testimony that Lewis sometimes exaggerated. When the prosecutor asked whether Lewis had said he did not want to go to back to prison, Dr. Wilkinson replied, "No, but he did tell me he wasn't crazy in quite emphatic terms."

12

The prosecutor asked Dr. Wilkinson whether the arrest report said Lewis was hallucinating on the day of his arrest; Dr. Wilkinson confirmed the report did not say that. The prosecutor asked whether, in the jail and prison population, there is "a good chunk of those people" with psychosis. Dr. Wilkinson said less than ten percent, but more than the general population. He said the jails have become our de facto mental health hospitals.

The prosecutor noted that in a probation report from several years earlier, Lewis admitted doing all that he could to be terminated from a camp program in the hope that he would be released to the custody of his mother. The prosecutor asked Dr. Wilkerson, "So doesn't that make you think, 'Hey, this guy knows how to play the system. He knows the Court will do X if he does Y.' And it worked back then. Why wouldn't it work now?" Dr. Wilkinson said it was a valid concern and one that he shared throughout the evaluation. Dr. Wilkinson said it was not unusual for a person to be able to talk to his mother and girlfriend and still have a low IQ and psychosis.

Clinical psychologist John Chellsen, who had written several articles on competency to stand trial, evaluated Lewis in December 2008. He reviewed school records and also reviewed medical and psychological records from the juvenile court, the county jail and the preliminary hearing. He also conducted his own independent testing. Dr. Chellsen concluded that Lewis had borderline intelligence, which he estimated at approximately the fifth percentile, consistent with testing performed when Lewis was 16. Although Lewis was reluctant to cooperate, Dr. Chellsen did not believe he was faking. He described Lewis as restless, distracted and subject to auditory hallucinations so strong he sometimes blacked out. Dr. Chellsen diagnosed Lewis with severe depression with psychotic features or schizoaffective disorder, noting that his predominant problem was the psychosis.

From the diagnoses and their severity, Dr. Chellsen concluded Lewis could not be competent to stand trial unless his psychosis could be reasonably well-controlled. Lewis's intelligence level alone was not determinative. In 25 years of experience, Dr.

13

Chellsen said he found malingering in only 10-15 percent of cases and Lewis was not malingering.

The prosecutor agreed on the record that all the experts were qualified. Witnesses for the prosecution included law enforcement and correctional officers who had been able to communicate with Lewis at various times, correctional officers who overheard him communicate with fellow prisoners and visitors and observed that he copied and added numbers on commissary orders and kept his cell tidy. The prosecutor also called Bryant's lawyer and three people who had known Lewis before the crime: his girlfriend between October 2008 and January 2009, his codefendant Bryant, and Bryant's niece, Brittany Grace. We will discuss some of that testimony in the discussion, *post*.

The prosecutor's closing argument was to the effect that, according to his codefendant Bryant, Lewis was "smarter than us" and "had more sense than you and I" and she would know because she lived with him. Referring to Lewis's jail tapes and letters and the testimony of people who knew Lewis from his arrests, from jail, and from living with him, the prosecutor said the doctors "didn't have this stuff. You do . . . ." The prosecutor pointed to evidence that Lewis once told a visitor that Lewis was charged with murder, demonstrating his understanding of the legal proceedings. The prosecutor said Lewis was not present at the time of closing arguments because he chose not to be present and added, "He can pound his head all he wants" but "you don't reward him with that behavior" by giving him a pass.

The closing argument by Lewis's defense counsel was to the effect that the medical experts had 137 years of collective experience in evaluating defendants. Defense counsel said the jail visitor conversation Lewis had about the fact that he was charged with murder was October 23, and Lewis was not put on medication for psychosis until November 8. Lewis's lawyer reminded the jury that they were to evaluate Lewis's competence to stand trial at the time of the competency trial, not at the time of his arrest

14

or in 2005 or 2007, when several law enforcement witnesses testified he had seemed able to understand them.

The jury found Lewis competent to stand trial.

All three defendants moved for separate trials, but their motions were denied. At the conclusion of the criminal trial, the jury found Bryant guilty of receiving stolen property and the trial court sentenced her to probation for five years. The jury convicted Lewis and Whatley of first degree murder, four attempted murders, eight armed robberies, two attempted robberies and a burglary. Various enhancement allegations were found to be true. The trial court sentenced them to life in prison without the possibility of parole for the murder, four life terms for the attempted murders, and determinate sentences totaling 40 years four months for Lewis and 17 years four months for Whatley. Additional relevant facts are included in the discussion.

## DISCUSSION

### I

Lewis challenges his competency trial, claiming (A) the prosecutor improperly preconditioned the jurors during voir dire, (B) Lewis was denied his right to confront Bryant when the trial court restricted her cross-examination, (C) the trial court erred in allowing testimony from Bryant's attorney, and (D) cumulative prejudicial error.

We begin with an overview of the law regarding competence to stand trial. A felony defendant has the right to be present at his or her trial, both physically and mentally. (*People v. Berling* (1953) 115 Cal.App.2d 255, 267 [citing Cal. Const., art. I, § 13 and Pen. Code, § 1043].) Requiring an accused "to stand trial while not in the full enjoyment of consciousness and mental power" is a fundamental error of constitutional proportions. (*People v. Berling, supra,* 115 Cal.App.2d at p. 270.) Trial of an incompetent person violates the Sixth and Fourteenth Amendments to the United States Constitution. (*Pate v. Robinson* (1966) 383 U.S. 375, 378 [15 L.Ed.2d 815, 818].)

15

The California procedure for determining whether a defendant is competent to stand trial begins with the premise that "[a] person cannot be tried or adjudged to punishment . . . while that person is mentally incompetent." (Pen. Code, § 1367, subd. (a).) When a judge has doubts about a defendant's mental competence at any time prior to judgment, the judge must inquire of defense counsel and, if counsel believes the defendant may be incompetent, the court must suspend proceedings and evaluate competency. (Pen. Code, § 1368.) "It is unfair to subject any defendant to criminal prosecution when he cannot understand the nature of the charges pressed against him or cannot assist in his own defense." (*People v. Bye* (1981) 116 Cal.App.3d 569, 576.) The purpose of Penal Code section 1368 is that "no defendant shall ever be convicted of a criminal charge when he was incapable of understanding or assisting during the trial of his alleged guilt." (*Bye, supra,* 116 Cal.App.3d at p. 577, italics omitted.)

As the United States Supreme Court explained, the standard for competence to stand trial is whether a defendant " 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him.' " (*Dusky v. United States* (1960) 362 U.S 402 [4 L.Ed.2d 824].) The right not to be tried or convicted while incompetent has "deep roots in our common-law heritage." (*Medina v. California* (1992) 505 U.S. 437, 446 [120 L.Ed.2d 353, 364] [citing authorities from the 18th and 19th centuries].)

Under California law, it is "presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent." (Pen. Code, § 1369, subd. (f).) This allocation of the burden of proof comports with federal due process. (*Medina v. California, supra,* 505 U.S. at p. 452 [120 L.Ed.2d at p. 367].)

A proceeding on the issue of mental competence begins with the court's appointment of one or more expert psychiatrists or psychologists to evaluate the

16

defendant's ability to understand the nature of the criminal proceedings and his ability to assist counsel in a rational manner. (Pen. Code, § 1369, subd. (a).) The medical experts also may recommend antipsychotic medications or other treatments. (*Ibid*.) The defense may submit the matter on the expert reports. (*People v. Weaver* (2001) 26 Cal.4th 876, 903-904.) When a trial is requested, the defense may present additional evidence, after which the prosecution may present evidence "regarding the issue of the defendant's present mental competence." (Pen. Code, § 1369, subds. (b) & (c).) A defendant may be found incompetent by a unanimous jury. (Pen. Code, § 1369, subd. (f).) If a defendant is found incompetent, his progress toward competence must be reported within 90 days and again at six-month intervals for up to three years, with a second hearing required 18 months after the first one. (Pen. Code, § 1370.) Once a defendant is found competent, criminal proceedings resume. (*Ibid*.)

The order for Lewis's competency hearing followed a series of courtroom outbursts in which he had to be restrained and forcibly removed. The trial court first stated its concern about competency on the record following a *Marsden* hearing, after which defense counsel stated on the record that he doubted Lewis's ability to rationally assist counsel and understand the nature of the charges and proceedings. Proceedings were suspended. The prosecutor asserted that belligerence or unwillingness to cooperate is sometimes "misunderstood as an inability to cooperate" and a defendant can abuse the distinction. The trial court acknowledged the prosecutor's concern but responded that it had seen enough to have no questions about appointing doctors to provide written evaluations.

The trial court appointed two experts, a psychiatrist and a psychologist. After both doctors reported to the trial court that Lewis was incompetent, Lewis agreed to stipulate to incompetence, but the prosecutor requested a jury trial on the issue. Counsel for Bryant asked for copies of the two doctor reports saying, "I want to see if this is a for real thing or make believe. And sometimes docs can be fooled as well."

17

A

Lewis contends the prosecutor improperly preconditioned the jurors during voir dire before the competency hearing.

Lewis claims the trial court should have prohibited the prosecutor from extensively questioning prospective jurors about their "street smarts," their ability to tell whether someone had tried to "pull the wool over their eyes," whether they thought it would be "pretty easy to fake" being incompetent by "doing crazy things" and whether, "if you were charged with some serious felonies and you had no way out . . . you might try to say you were incompetent so that you [¶] . . . [¶] wouldn't have to face the music." Questions in a similar vein were extensive. Lewis objected that the prosecutor was "pre-trying the case," but his objection was overruled. In response to the prosecutor, one prospective juror agreed that she could fake incompetence, explaining that, to do so, she would talk to herself, act crazy, run around and scream. The prosecutor asked another witness whether it would be "kind of easy to fake incompetence." That witness responded, "I think if you're trying to get away with something, you can do whatever you want in order to get what you want to do or get where you want to be."

A trial court has broad discretion in voir dire; the discretion is abused only when questioning "is not reasonably sufficient to test prospective jurors for bias or partiality. [Citation.]" (*People v. Tafoya* (2007) 42 Cal.4th 147, 168.) In this context, bias is a state of mind "which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(C).) Lewis recognizes that a juror who would unconditionally accept or unqualifiedly reject the testimony of experts would have been properly removed for bias, but argues the prosecutor's questions went beyond determining whether the jurors were biased and indoctrinated them to believe that it would be easy to fake incompetence and that Lewis had done so, duping the medical experts.

Counsel's right to question prospective jurors does not include a right to "educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law." (*Rousseau v. West Coast House Movers* (1967) 256 Cal.App.2d 878, 882, quoted in criminal cases cited recently by *People v. Abilez* (2007) 41 Cal.4th 472, 492-493.) A trial court may, in its discretion, limit the questioning of prospective jurors by counsel. (Code Civ. Proc., § 223.) In deciding which questions counsel may ask prospective jurors, trial courts are accorded "great latitude." (*People v. Earp* (1999) 20 Cal.4th 826, 852, quoting *Mu'Min v. Virginia* (1991) 500 U.S. 415, 424 [114 L.Ed.2d 493, 505].) Objectionable statements during jury selection are not inherently likely to unduly influence a jury's verdict because, at that stage, the jurors have not yet begun to consider arguments or evidence. (*People v. Medina* (1995) 11 Cal.4th 694, 741; *People v. Ghent* (1987) 43 Cal.3d 739, 770.) Reversal based on errors during voir dire is appropriate only if there is a reasonable likelihood the jury construed or applied improper remarks in an objectionable fashion and the totality of the evidence demonstrates the likelihood of a more favorable result absent misconduct. (*People v. Castillo* (2008) 168 Cal.App.4th 364, 385-386.)

We agree with Lewis that many of the prosecutor's voir dire questions were inappropriate. The prosecutor repeatedly asked potential jurors to consider how easy it would be for them to fake incompetence if they wanted to avoid responsibility for serious misconduct. Those questions did not simply illicit information about a prospective juror's bias toward medical experts, the questions also asked potential jurors to think about how they might fool the experts. Asking whether a motivated juror could "pull the wool over the eyes" of a mental health professional to avoid "facing the music" did not aid in assessing whether the juror could properly weigh expert testimony. (See Code Civ.

19

Proc., § 223 ["Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause."])

Lewis objected to one of the prosecutor's early voir dire questions about whether it would be easy to feign incompetence. The trial court overruled the objection, reasoning that the question was directed at a challenge for cause, to identify overconfidence in medical experts. Lewis did not renew the objection and never requested a trial court admonition to the jury in that context, potentially subjecting him to forfeiture of his claim that the prosecutor committed misconduct during voir dire. (*People v. Price* (1991) 1 Cal.4th 324, 447.) Nonetheless, application of the forfeiture rule is not automatic and does not necessarily deprive an appellate court of authority to address cumulative prejudicial error. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; see also *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.) We address Lewis's claim of cumulative prejudicial error later in this opinion.

B

Bryant testified for the prosecution regarding Lewis's competence. Lewis contends the trial court deprived him of his Sixth Amendment right to confront witnesses when it restricted his cross-examination on the topic of Bryant's role in the crimes.

Sixth Amendment rights are violated when a criminal defendant is prohibited from conducting otherwise appropriate cross-examination in order to prove "prototypical" bias and to expose facts from which the jury may draw inferences about the witness's reliability. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 684].) Exposing the bias or motive of a witness is a "proper and important" function of cross-examination. (Evid. Code, §§ 761, 780, subd. (f); *Davis v. Alaska* (1974) 415 U.S. 308, 316 [39 L.Ed.2d 347, 354]. ) It is error to restrict cross-examination in a way that prevents a criminal defendant from effectively attacking the credibility of a key witness. (*People v. Allen* (1978) 77 Cal.App.3d 924, 933.) Nonetheless, trial judges maintain broad discretion to limit cross-examination that would cause undue harassment,

20

expenditure of time, confusion of issues or threats to the safety of a witness. (*People v. Jennings* (1991) 53 Cal.3d 334, 372, citing Evid. Code, § 352 and *Delaware v. Van Arsdall, supra*, 475 U.S. at p. 679 [89 L.Ed.2d at p. 683].)

Improper denial of cross-examination requires reversal unless the error was harmless beyond a reasonable doubt. (*Delaware v. Van Arsdall, supra*, 475 U.S. at p. 684 [89 L.Ed.2d at p. 686], citing *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710].)  Factors to be considered in evaluating the gravity of denying cross-examination include the importance of the witness' testimony, whether it was cumulative, whether there was corroborating or contradicting testimony, the extent of cross-examination otherwise permitted and the overall strength of the prosecution's case. (*Delaware v. Van Arsdall, supra*, 475 U.S. at p. 684 [89 L.Ed.2d at p. 686].)

Bryant testified that she had known Lewis for three years and had talked to him about "everything," including life, kids and books.  She said they did not have trouble understanding one another and he could even read and explain novels.  Bryant added, "He's got plenty sense" and "he's not crazy."  She continued, "I think he understands well -- fully well what's going on" and "He only acts like a fool when he comes to court."  She said she saw Lewis daily when she lived with him and she knew he could send text messages and use a computer to access social media and download music.  She testified that he played basketball, drove a car, visited friends and flirted with girls. [3]

_____

[3]  A letter in Bryant's pocket when she was arrested indicated something different.  The letter described a pattern of physical violence, saying Lewis "has tormented me and the rest of the household.  He has his own mother afraid of him."  It continued, "I'm afraid that if [police] pick him up and don't keep him he will look for me and kill me.  I know that I should have reported it long ago but I was afraid.  He torments people because he was abused by his foster parent.  I think that he is suppose[d] to be on syke [*sic*] meds . . . ."  As defense counsel acknowledged, the letter was mentioned in a police report where Bryant was reported to have acknowledged writing the letter and her belief that Lewis had a "crazy temper."  Lewis's counsel said he did not have the letter at the time of

21

Defendant's counsel began to cross-examine Bryant at the competency trial about the charges against her. Bryant acknowledged that she was charged with special circumstances homicide. Defense counsel then asked her about a videotape showing her using the murder victim's debit card after the murder. The prosecutor objected that the question was beyond the scope of direct examination, and the trial court sustained the objection. Defense counsel asserted his right to question Bryant about motive and bias. The prosecutor argued that Lewis was "playing a game" by trying to force Bryant to assert the Fifth Amendment in order to force the trial court to strike her testimony. Bryant's counsel claimed the facts of the crimes were not relevant to a competency trial and the requested cross-examination was no more than improper discovery.

After Lewis's counsel asked Bryant if her conversations with Lewis included plotting robberies, the trial court interrupted to ask Bryant's lawyer whether Bryant intended to assert a privilege. Bryant's lawyer turned to Lewis's lawyer and said, "You know what, you want to go there? Go there." Bryant's lawyer said if Lewis's counsel wanted to challenge him in front of a jury, he was "not afraid of it" and "I'll throw it in his face because that's the way it's going to come out." Lewis's lawyer said Bryant's lawyer was a "much better showman than I am." The trial court ultimately agreed to make Bryant available for recall and to preliminarily consider Lewis's proposed questions about the crimes. Counsel for Bryant said if his client were recalled, she would be asserting her Fifth Amendment privilege.

Following the argument about Bryant's cross-examination, the trial court informed the jury that the trial court was sustaining the prosecutor's objection and would not allow defense counsel to go into the facts of the underlying crimes. Lewis's counsel continued cross-examination and asked Bryant again whether she understood that she was charged

the competency trial and later said he intended to "file the appropriate motions" about it although no such motions appear in the record.

22

with special circumstances homicide and was facing a sentence of life in prison. Bryant responded in the affirmative. On redirect, Bryant indicated she had never spoken to the prosecutor before and was testifying under subpoena.

When a witness does not submit to cross-examination, the conventional remedy is to strike the direct testimony of that witness. (*Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 735-736.) The prosecutor mentioned that remedy, suggesting that Lewis's counsel was trying to trigger it. But Lewis's counsel did not recall Bryant to the witness stand, did not force her assertion of her privilege and did not move to strike any part of her testimony. There is no explanation in the record or the appellate briefs for the apparent abandonment of the confrontation clause issue, although Lewis urges us to find ineffective assistance of counsel if we conclude he forfeited his claim.

We reach the merits and conclude Lewis has not established a violation of the confrontation clause. The only restriction imposed by the trial court on Lewis's cross-examination of Bryant pertained to questions about factual details of the crimes. Lewis's counsel was free to cross-examine Bryant on other topics, including the nature of the charges pending against her and the fact that she was awaiting trial. The jury heard about Bryant's appearance on a videotape trying to obtain cash with a card from the murder victim's wallet. And in closing argument, defense counsel referenced Bryant's testimony during the cross-examination, saying, "I don't buy anything that she has to say" because the prosecutor charged her with special circumstances homicide and "[s]he's got a real big motive . . . to have Mr. Lewis competent [in that] she wants to pin everything on Mr. Lewis." Lewis does not identify other inferences that might have been drawn if his counsel had been allowed additional cross-examination about the crimes, and none are apparent.

The time of the trial is the only time period relevant to a defendant's competence to stand trial. (*People v. Acosta* (1971) 18 Cal.App.3d 895, 900.) Bryant's testimony was based on the time Lewis lived in her household, which was long before the trial.

In any event, although Bryant's testimony indicated that Lewis was intelligent and sane, Lewis's cross-examination established that Bryant was with Lewis the morning of the crime, was standing trial with him and was "pissed off" about it. She knew she faced the possibility of life in prison. Lewis does not explain how additional questions about the crimes might have impeached Bryant more effectively.

Lewis was given the opportunity to confront and cross-examine Bryant about the pending criminal charges. There is no indication that additional questions about the crimes "might reasonably have [produced] a significantly different impression" of the witness. (See *Delaware v. Van Arsdell, supra,* 475 U.S. at p. 680 [89 L.Ed.2d at p. 684].) Lewis has not established a confrontation clause violation.

C

Lewis argues the trial court erred in allowing testimony from Bryant's attorney. We agree.

The prosecutor called Bryant's lawyer and asked, "do you, as a layperson, have an opinion about [Lewis's] ability to understand what's going on and assist counsel?" Lewis's attorney objected, but before he could complete his articulation of the grounds for the objection, the trial court overruled the objection, saying the questions were just calling for the witness's personal observations as a layperson.

Bryant's lawyer testified that he had been an attorney for 20 years, a California Highway Patrol officer for seven years, a private investigator for a few years and that he had observed Lewis in court. When asked if there was anything he had done to "test" whether Lewis "knew what was going on," Bryant's attorney said one day in the courtroom he "locked eyes" on Lewis. According to Bryant's attorney, Lewis looked at him and it became a staring contest. Eventually Lewis said, "What the fuck are you looking at?" The prosecutor asked about the significance of Lewis's response "as far as your opinion on his competency?" Bryant's attorney replied, "-- that he understood that I'm Miss Bryant's attorney. I'm in an adversarial position --" Lewis's attorney objected

24

and moved to strike the testimony as speculative. The trial court sustained the objection and granted the motion to strike. But then the prosecutor explained, "I'm asking for his lay opinion, not as a doctor, but he's a layperson, his opinion on [Lewis's] competence, based on his numerous contacts with him in court and based on his locking of the eyes." The trial court said that question was fine. The prosecutor then asked Bryant's attorney, "what is your opinion?" Bryant's attorney answered, "That he understands my significance. He understands the process that -- that I'm the attorney. That I represent Miss Bryant. And -- and my job is to defend her."

Witnesses may not give testimony based on conjecture or speculation because such testimony has no tendency in reason to resolve questions in dispute. (*People v. Chatman* (2006) 38 Cal.4th 344, 382 [citing Evid. Code, §§ 702 and 210].) A question asking a witness to explain what others understood or thought calls for impermissible speculation. (*People v. Blacksher* (2011) 52 Cal.4th 769, 841-842.) The trial court erred when it permitted the witness to speculate about what Lewis did or did not understand about the proceedings.

During cross-examination, Bryant's attorney added, with no question pending, "I've heard and seen you [referring to Lewis's counsel] talk to Mr. Lewis. Mr. Lewis understands what you're telling him [¶] . . . [¶] and what you talk about." In response to a question about who was present in court during the alleged staring contest, Bryant's attorney testified, "My client wasn't there. But if I recall correctly, [the defendants'] appearances were waived because I've been pushing to get the thing to trial. Be done. We'd be in trial 60 days after." Bryant's attorney added, with no question pending, "You guys are slowing me down. And my purpose being here is to help get this thing off the ground. Let's go to trial." Following a clarification of the right to a speedy trial and his client's waiver of that right, Bryant's attorney said Lewis' codefendants were waiting and "You guys are holding up the show [with the competency trial]." "Once this procedure is completed," he said, "we can make the case that we're going to do." He

25

denied that he planned to use the joint trial to "blame everything on Mr. Lewis" but he added that the evidence at trial would prove his client not guilty.

The testimony by Bryant's attorney provided no foundation in reason for assessing Lewis's competency to stand trial. The expertise required for making that determination is psychiatric or psychological, not legal. (Pen. Code, § 1369.) A lay witness may offer opinion testimony only if the opinion is based on his own perception and is "helpful to a clear understanding of his testimony." (Evid. Code, § 800.) An opinion about another person's credibility is not helpful to an understanding of a witness's description of what he observed; it invades the province of the jury and is never admissible. (*People v. Smith* (1989) 214 Cal.App.3d 904, 915.)

The trial court ruled that the witness was allowed to offer an opinion because it was based on his own observations in the courtroom. A layperson who has observed actions consistent with drunkenness may offer an opinion from those observations that someone was intoxicated. (*People v. Garcia* (1972) 27 Cal.App.3d 639, 643 [it is common to associate the smell of liquor, slurred speech and an unsteady gait with drunkenness].) But a lay person may not give an opinion about whether a person has an intellectual disability because such a disability has a legal definition not commonly understood by people of reasonable intelligence. (*In re Krall* (1984) 151 Cal.App.3d 792, 797.) Such an opinion may be offered only by a qualified expert. (*Ibid.*) Similarly, lay opinion about another person's ability to distinguish right from wrong is inadmissible. (*People v. O'Brien* (1932) 122 Cal.App. 147, 150.) Qualified psychiatric or psychological experts, on the other hand, can and do opine on such matters, even though it is ultimately a question for the jury to decide. (*People v. Woods* (1937) 19 Cal.App.2d 556, 562-563.) An ordinary layperson's opinion about whether someone is competent to stand trial, like a conclusion about whether he has an intellectual disability or is insane, is inadmissible because such opinions are, in the language of Evidence Code section 800, not "helpful to a clear understanding" of what the witness observed. Consistent with the

26

cited authorities, the lay opinion by Bryant's attorney about whether Lewis understood the proceedings and meaningfully communicated with his lawyer did not meet the statutory requirements for lay opinion and should not have been admitted into evidence.

Because of their persuasiveness and despite their relevant expertise, lawyers are explicitly prohibited from testifying on issues reserved for the jury. (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 971.) When an opinion, especially that of a lawyer, amounts to no more than an expression of the witness's belief about how the case should be decided, the opinion supplants the jury, rather than aiding it. (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1182-1183.)

In the face of evidentiary error, we evaluate whether a more favorable outcome would have been reasonably probable in the absence of the error. (*People v. Marks* (2003) 31 Cal.4th 197, 226-227 [applying *Watson* standard].) In the "rare and unusual" case where the improperly admitted evidence deprived a defendant of due process rights and rendered the trial fundamentally unfair, we apply the *Chapman* test.[4] (*People v. Albarran* (2007) 149 Cal.App.4th 214, 228-232.) As we explain in the next section, our conclusion is the same under either standard.

## D

Lewis contends the cumulative effect of the errors in his competency trial resulted in a reasonable probability that the jury would have reached a more favorable result without them. We are mindful that in a situation like this one "the litmus test is whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349, disapproved on other grounds in *People v. Whitmer* (2014) 59 Cal.4th 733.)

---

[4] *Chapman v. California, supra*, 386 U.S. at p. 24 [17 L.Ed.2d at p. 711] [reversal required unless State proves beyond a reasonable doubt that error did not contribute to verdict].

The federal Constitution requires the states to "observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial." (*Drope v. Missouri* (1975) 420 U.S. 162, 172 [43 L.Ed.2d 103, 113].) The purpose of a competency proceeding under Penal Code section 1368 is different from other mental health proceedings in that "the protection of society in general is not a consideration," rather "[t]he law seeks only to protect the accused. It is unfair to subject any defendant to criminal prosecution when he cannot understand the nature of the charges pressed against him or cannot assist in his own defense. Even when a defendant resists this protection by opposing the evidence of incompetency, it would be unfair to deny him the benefit of treatment for his condition before subjecting him to a potential loss of life or liberty in the criminal proceeding." (*People v. Bye, supra,* 116 Cal.App.3d at p. 576, italics omitted.)

We are aware that the competency trial was difficult and that the trial court took many steps to try and make it fair. At one point Lewis refused to go to court, telling a jailer the judge could "suck his dick." His lawyer asked him to be present because his friends and family would be testifying and the lawyer needed his input, but Lewis refused to participate, reiterating that he did not want to be there. He was kept out of the courtroom that day because of his threats to spit on people. He had to be "taken down" by officers and escorted out of the courtroom on a number of occasions. The trial court ordered a more secure courtroom, arranged for Lewis to be accompanied by a Custody Emergency Response Team, and ordered him shackled to an eyebolt on the floor with chains hidden by a table skirt. When he was removed from the courtroom, the trial court set up a camera in another room so Lewis could observe the trial. Lewis's lawyer stated during trial that he had not been able to communicate with his client at a critical juncture, reminding the trial court that Lewis' nickname was "No No" (Know No Better) and his IQ was "less than the room temperature." Afterward, the trial court described the competency trial as "really scary" due to Lewis's kicking, yelling and screaming.

Nonetheless, we have described the prosecutor's inappropriate questions during voir dire, the testimony from the medical experts, the prosecutor's cross-examination of the medical experts (including asking about materials that the prosecutor had not provided to the witnesses; asking whether persons committed to a hospital are given day, weekend or holiday passes; asking whether there are more claims of incompetence in multiple-defendant cases; stating that Lewis had been "showboating" to girls in the courtroom audience; and placing his hand in a mock shooting motion against the heads of jurors), the inadmissible testimony from Bryant's attorney, and the prosecutor's closing arguments. Medical experts testified that Lewis had a major mental illness of psychosis, among other things, and that he was incompetent to stand trial. No expert testified that he was competent. "Of course, the jury is not required to accept at face value a unanimity of expert opinion: 'To hold otherwise would be in effect to substitute a trial by "experts" for a trial by jury . . . .' " (*People v. Samuel* (1981) 29 Cal.3d 489, 498, quoting *People v. Wolff* (1964) 61 Cal.2d 795, 811.) We recognize that the jury was in the best position to view the witnesses, and that several witnesses testified about their observations of Lewis. We also recognize that in California, a defendant is presumed mentally competent unless it is proven by a preponderance of the evidence that the defendant is mentally incompetent. (Pen. Code, § 1369, subd. (f).) But the competency trial must afford the defendant due process and it must be fair. Although Bryant's lawyer was not an expert witness, the jury heard testimony that he had been an attorney for 20 years and had also worked as a California Highway Patrol officer and a private investigator. He testified that the competency trial was delaying a criminal trial for the other codefendants, and his inadmissible testimony was consistent with the prosecutor's repeated suggestions throughout the trial that Lewis was feigning mental illness to avoid a criminal trial. There is a reasonable probability that if the cumulative errors had not occurred, the jury might have credited the expert testimony and found Lewis not competent to stand trial.

29

The cumulative errors cause us to conclude Lewis's constitutional rights to due process and a fair trial were abridged.

We will reverse Lewis's conviction and remand the matter to the trial court for a new evaluation of Lewis's competency to stand trial. The experts opined that he had the potential for competency with effective treatment. When a court has determined that Lewis is able to understand the charges against him and to communicate effectively with his lawyer, he may be retried. Because we reverse the conviction, we do not reach Lewis's contentions of error in the criminal trial.

II

A

Whatley contends the trial court abused its discretion in denying his motion to sever his trial from Bryant's trial.

"When two or more defendants are jointly charged with any public offense," they must be tried together unless the trial court in its discretion orders separate trials. (Pen. Code, § 1098.) This discretion is abused if a joint trial leads to the admission of otherwise inadmissible incriminating extrajudicial statements made by one joint defendant and offered by another. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1207, citing *People v. Aranda* (1965) 63 Cal.2d 518, 529-530 (*Aranda*); see also *Bruton v. United States* (1969) 391 U.S. 123 [20 L.Ed.2d 476] (*Bruton*).)

Whatley raises no *Aranda-Bruton* issues on appeal. Instead, he cites *People v. Greenberger* (1997) 58 Cal.App.4th 298, 344, for the principle that trials should be separate when the defenses are antagonistic to one another. But as the court in *Greenberger* observed, while a trial court certainly may choose to sever on the basis of conflicting defenses, no appellate court has found an abuse of discretion or reversed a conviction when severance was denied on that basis. (*Greenberger, supra,* 58 Cal.App.4th at p. 344, citing *People v. Boyde* (1988) 46 Cal.3d 212, 232.) In other words, severance is not required merely because defendants plan to shift responsibility to

30

one another.  (*People v. Box* (2000) 23 Cal.4th 1153, 1196.)  If antagonistic defenses alone justified severance, the legislative preference for joint trials would be negated. (*People v. Hardy* (1992) 2 Cal.4th 86, 168.)

All three defendants joined in a motion to sever; the motion asserted that a joint trial would trigger *Aranda-Bruton* issues.  The trial court heard argument and asked counsel to explain the application of *Aranda-Bruton* to the evidence they expected to offer at trial.  The trial court initially observed that *Aranda-Bruton* would seem not to apply to Bryant's statements because she intended to take the stand and be subject to cross-examination, but further argument was permitted.  The prosecutor asserted the defenses were consistent because Whatley and Lewis said they found a wallet with a credit card and pin number inside; Bryant said Whatley and Lewis arrived at her house with the wallet in hand and the three defendants took the card and pin number to an ATM.  But Bryant's lawyer argued the defenses were not consistent.  Although Bryant used the credit card, she expected to testify that it did not make sense that the other defendants found the credit card within minutes of the murder.  Lewis's lawyer pointed out that the conflict and need for severance already had been demonstrated when Bryant's lawyer acted as a second prosecutor during his client's competency hearing. The prosecutor conceded that it was "pretty clear" the defense theories were antagonistic.

Denying the motion, the trial court said severance was not necessary because Bryant would not be testifying that Lewis or Whatley told her they committed a crime or revealed to her any details of a crime.  The trial court agreed, however, to address any problems with the joint trial if they arose.  The trial court prevented Bryant from testifying about what Lewis and Whatley said to her about the wallet and its contents.

Whatley claims Bryant's lawyer subsequently questioned witnesses in a way that appeared to be directed at convicting Whatley and Lewis, even for crimes having no relationship at all to the charges against Bryant.  According to Whatley, the trial court acknowledged this near the end of the trial.  And during closing argument, Bryant's

31

lawyer attacked the arguments made by the other defense lawyers and pointed to evidence proving the other defendants guilty. In response to an objection about this issue during trial, Bryant's lawyer explained that he wanted to be sure the jury did not conclude his client was involved in the robberies in any way.

Those circumstances do not render the trial unfair unless the evidence adduced by Bryant's attorney would have been inadmissible at a separate trial. (*People v. Jackson, supra,* 13 Cal.4th at p. 1208.) Whatley identifies no otherwise-inadmissible evidence elicited by Bryant's lawyer. Instead, Whatley argues the evidence, especially on the murder charge, was "wholly insufficient" to support conviction, and the prosecutor's burden must have been "impermissibly lightened" by the support of Bryant's lawyer. That is pure speculation.

In any event, our review of a trial court's denial of a motion to sever is limited to the time that the motion is heard; if other grounds for severance develop later, a defendant must renew his severance motion in order to preserve the issue for appeal. (*People v. Ervin* (2000) 22 Cal.4th 48, 68.) Whatley did not renew his motion to sever.

We review a trial court's denial of a severance motion for abuse of discretion. (*People v. Cleveland* (2004) 32 Cal.4th 704, 726.) The severance motion here was based on *Aranda-Bruton* and the trial court properly concluded that none of the defendants presented evidence that would trigger the rule of those cases. (See *People v. Massie* (1967) 66 Cal.2d 899, 919 [*Aranda-Bruton* error not to order separate trials when one defendant's confession implicates another].) To obtain severance on the broader ground of "conflicting defenses," the moving party must demonstrate that the defenses are so irreconcilable that the fact finder's acceptance of one party's defense would preclude the acquittal of another. (*People v. Hardy, supra,* 2 Cal.4th at p. 168.) Whatley points to an example of such a case in *United States v. Tootick* (9th Cir. 1991) 952 F.2d 1078, where each defendant swore he had done nothing himself but had witnessed the other defendant viciously attacking the victim. (*Id*. at p. 1081.) Even in that case, however, a joint trial

32

may have been acceptable with proper limiting instructions.  (*Id*. at p. 1085; see also *Zafiro v. United States* (1993) 506 U.S. 534, 540 [122 L.Ed.2d 317] [separate trials are not required just because the chance of acquittal would be improved; prejudice from a joint trial can often be cured with proper instructions].)  Defendants did not establish that their defenses were irreconcilable or mutually exclusive, nor do they complain on appeal about limiting instructions being denied.  The trial court did not abuse its discretion in denying severance.

A conviction may be reversed for unfairness so profound a defendant was deprived of a fair trial.  (*People v. Pinholster* (1992) 1 Cal.4th 865, 933 disapproved on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 636.)  Whatley's contention, however, boils down to a claim that Bryant's lawyer elicited admissible testimony from trial witnesses and made arguments in closing that otherwise might have been overlooked or underemphasized by the prosecutor.  Whatley asserts that he might have been acquitted but for Bryant's lawyer acting as a second prosecutor.  Even if that is true, it is not grounds for reversal because the harmful but admissible evidence may well have been presented by the prosecutor if Whatley had been tried alone.  (See *People v. Terry* (1970) 2 Cal.3d 362, 390 disapproved on other grounds by *People v. Carpenter* (1997) 15 Cal.4th 312, 381 [no prejudice in joint trial despite *Aranda* error because same damaging evidence from codefendant could have been admitted in separate trial].)

The record does not support a conclusion that Whatley was deprived of a fair trial simply because it was a joint trial.

B

Whatley next claims the prosecutor committed misconduct by charging Bryant with murder even though the prosecutor did not believe Bryant was guilty of murder.

Whatley points to no evidence that the prosecutor believed Bryant was not guilty. In fact, the record indicates otherwise.  In the context of a motion to limit questioning of witnesses by Bryant's lawyer, Lewis's lawyer suggested there was "not a scintilla of

33

evidence" to support the homicide charge against Bryant and, joined by Whatley, asked the prosecutor to dismiss the charge. The prosecutor declined, pointing to a trial exhibit showing a Bank of America image of Bryant and asking, "Who is using [the murder victim's] credit card minutes after he's murdered?"

In any event, prosecutors have broad discretion to prosecute or decline to prosecute someone when there is probable cause to believe the person has committed a crime. (*Davis v. Municipal Court* (1988) 46 Cal.3d 64, 77.) In evaluating whether there was probable cause, we are mindful that "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed." (Pen. Code, § 31.)

Here there was probable cause to charge Bryant with murder. There is evidence that Bryant was dating Lewis's mother and Lewis lived at her residence. Lewis and Whatley were friends. Within an hour after the murder, Bryant, Lewis and Whatley took the murder victim's credit card to a Valero Country Market, where Bryant made withdrawals from an ATM. Whatley used the card to buy gas at another gas station and the group made other unsuccessful attempts to use the card. When the group returned to Bryant's residence, she placed the victim's wallet under a dresser. There was probable cause to believe that Bryant was "concerned in the commission of" the murder. (Pen. Code, § 31.) Whatley's claim of prosecutorial misconduct lacks merit.

C

Whatley further contends his lawyer was ineffective because he did not move to sever Whatley's trial from Lewis's trial.

We have already explained that when two or more defendants are jointly charged with any public offense, they must be tried together unless the trial court in its discretion orders separate trials. (Pen. Code, § 1098.) Policy favors joint trials and reversal based on denial of a severance motion is rare. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1048-

34

1049.)  Whatley does not deny that he and Lewis were charged with the same crimes and asserted the same defenses, but he argues his lawyer should have sought severance on the basis that Lewis was a "disruptive and unstable person."

To prove ineffective assistance of counsel, a defendant must prove that his lawyer's performance fell below an objective standard of reasonableness and that there is a reasonable probability the outcome would have been different but for the lawyer's error or omission.  (*Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674].)  Applied to a claim of ineffective assistance for failure to move for severance, a defendant must demonstrate not only that there was no tactical reason for the lawyer not moving for severance, but also that it is reasonably probable the motion would have been granted. (*People v. Mattson* (1990) 50 Cal.3d 826, 875-876.)  Whatley has not met his burden.

Lewis was shackled during trial because of outbursts, violence and disruptions during earlier proceedings, including the one at which he was found competent to stand trial.  The trial court noted that Lewis had assaulted his lawyer in court and had to be removed a number of times because of kicking, yelling and screaming.  For that reason, the trial court ordered shackles on his hands and feet and a chain around his waist attached to the handcuffs, all attached to an eyebolt in the floor.  The trial court tried to minimize the jury's exposure to the shackling, however, by placing a skirt around counsel table.  During a discussion of these and other security arrangements, the prosecutor reported that an informant warned him Lewis "wanted to go out" just like another defendant who had been shot and killed in the same courthouse after stabbing a judge, and that Lewis had threatened to beat up and spit on his attorney so he could get a new one.

Whatley does not take a position on the propriety of shackling Lewis, but claims the fact that Lewis was shackled reflected poorly on Whatley.[5] Whatley cites *People v. Duran* (1976) 16 Cal.3d 282, 290, for the proposition that shackling a defendant causes prejudice in the minds of jurors. *Duran* does discuss potential prejudice arising from a defendant's shackling, but it is silent about potential prejudice to codefendants. Whatley has not cited any authority that might have caused the trial court to grant a motion to sever Whatley's trial from Lewis's trial. And given the trial court's denial of the other severance motions, it was not reasonably probable that such a motion would have been granted. There was no ineffective assistance of counsel.

## DISPOSITION

The judgment against Lewis is reversed and his case is remanded to the trial court for evaluation of whether he is competent to stand trial and to retry him only if and when he has become competent. The judgment against Whatley is affirmed.


                                        MAURO    , J.


We concur:


    BLEASE    , Acting P. J.


    ROBIE    , J.

---

[5] Whatley says the jury saw Lewis in shackles in the hallway outside the courtroom, but he cites to no evidence of such a sighting in the record. We do not consider matters outside the record. (*People v. Pearson* (1969) 70 Cal.2d 218, 221, fn. 1.)